✓ __ FILED        __ LODGED
__ RECEIVED    __ COPY

JUL 1 3 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

Antony S. Burt, SB# 6183449 (Illinois)
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
tel: (312) 258-5500
fax: (312) 258-5600
aburt@schiffhardin.com
(*pro hac vice* to be filed)

Attorneys for the Federal Deposit
Insurance Corporation as Receiver for
Community Bank of Arizona

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Federal Deposit Insurance Corporation as Receiver for Community Bank of Arizona;<br><br>Plaintiff,<br><br>vs.<br><br>Edward M. Jamison; Stephen R. Curley; James E. Nelson; LeRoy R. Aman; Leanne B. Appledorn-March; Richard L. Murphy; and Phillip B. Whitaker;<br><br>Defendants. | Case No.   CV 12-01508-PHX-DGC<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Community Bank of Arizona ("FDIC-Receiver"), for its Complaint states as follows:

### NATURE OF THE CASE

1. The FDIC-Receiver brings this lawsuit in its capacity as Receiver for Community Bank of Arizona ("CBOA" or "Bank") of Phoenix, Arizona, to recover compensatory and other damages in excess of $11 million. This lawsuit is against seven former officers and directors of CBOA (collectively the "Defendants"): Edward M. Jamison ("Jamison"), Stephen R. Curley ("Curley"), and James E. Nelson ("Nelson") (the "Officer and Director Defendants") as well as  LeRoy R. Aman ("Aman") Leanne B.

Appledorn-March ("Appledorn-March"), Richard L. Murphy ("Murphy"), and Phillip B. Whitaker ("Whitaker") (the "Director Defendants").

2.    The Defendants were charged with overseeing the safety and soundness of a community bank. But rather than manage the Bank in a responsible manner, the Defendants took unreasonable risks with CBOA's asset portfolio, violated the Bank's own policies and procedures when approving the acquisition of loans, ignored warnings regarding risky real-estate and construction loans, and knowingly permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards. The FDIC-Receiver accordingly asserts claims for gross negligence and breach of fiduciary and other legal duties against all Defendants and additionally asserts claims against the Officer and Director Defendants for ordinary negligence.

3.    Each of the Defendants affirmatively approved the acquisition of an interest in one or more loans described in more detail below, as well as other improvident extensions of credit, in their capacities as voting members of CBOA's Board Loan Committee (the "BLC"). These approvals were negligent, grossly negligent, and in breach of the Defendants' fiduciary duties to CBOA and caused the Bank substantial damages.

4.    Among other problems, the Defendants approved the purchase of interests in numerous loans—many of which were at or very near the Bank's legal lending limit—without CBOA's having conducted its own underwriting of the loans. Instead, the Defendants improperly approved these purchases based on at best outdated or inadequate underwriting by other institutions, including CBOA's much larger "sister bank," the Community Bank of Nevada ("CBON"), which failed and went into receivership the same day as CBOA. The Defendants either actively encouraged—or did nothing to stop—CBON's exploiting its relationship with CBOA to try to improve the quality of its own loan portfolio at CBOA's expense.

5.    The rubber stamping of CBOA's loan purchases and the Defendants' acts of negligence, gross negligence, and breach of fiduciary duty violated the Bank's loan policies and procedures, underwriting requirements, banking regulations, and prudent and sound banking practices.  Specifically, the Defendants' actions and omissions resulted in the following: (1) failure to ensure that all of the purchased loan interests met CBOA's underwriting requirements, (2) failure to conduct independent financial analyses of these purchases, (3) failure to obtain complete and recent appraisals before making these purchases, (4) failure to review complete and recent borrower and guarantor financial information before making the purchases, (5) failure to conduct an independent site investigation before making the purchases, and (6) failure to calculate accurately the Bank's high concentration in risky commercial real estate ("CRE") lending during a time of well-recognized national and local economic distress.  These numerous, repeated, and obvious breaches actually and proximately caused CBOA substantial damages, for which the FDIC-Receiver now sues.

## THE PARTIES

6.    The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e).  The FDIC has its principal place of business in Washington, D.C.  The FDIC was appointed receiver for CBOA on August 14, 2009, following the Bank's closure by the Arizona Department of Financial Institutions ("ADFI").  The FDIC-Receiver brings this case in its capacity as the Bank's Receiver under authority granted in 12 U.S.C. § 1821.  As set out in 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC-Receiver succeeded to all rights, titles, and privileges of CBOA and its stockholders, account holders, and depositors, including (but not limited to) the right to pursue claims against the Bank's former directors and officers, including those claims asserted herein against each of the Defendants.

7.    CBOA was a state-chartered bank based in Glendale, Arizona that operated out of four branches in the Phoenix-metropolitan area.

8.    Defendant Jamison was the Bank's President from on or about July 17, 2007, until on or about January 17, 2008. He was also Chief Executive Officer ("CEO") from on or about July 17, 2007, and Chairman of the Board of Directors ("Board") from on or about October 10, 2007, until the Bank failed on August 14, 2009. In addition to his positions at CBOA, Jamison was Chairman and CEO of both CBOA's sister bank, CBON, and Community Bancorp, Inc. ("Bancorp"), which was the common holding company for both CBOA and CBON. Jamison is a citizen of Nevada residing in Las Vegas, Nevada.

9.    Defendant Curley was President and a director of the Bank from on or about January 17, 2008, until the Bank failed on August 14, 2009. Curley is a citizen of Arizona residing in Scottsdale, Arizona.

10.    Defendant Nelson was Chief Credit Officer ("CCO") and a director of the Bank from on or about December 11, 2006, until on or about November 21, 2008. Nelson is a citizen of Arizona, residing in Fountain Hills, Arizona.

11.    Defendant Aman was a director of the Bank from on or about November 28, 2003, until on or about July 21, 2009. Aman is a citizen of Arizona, residing in Phoenix, Arizona.

12.    Defendant Appledorn-March was a director of the Bank from on or about May 19, 2004, until on or about July 21, 2009. Appledorn-March is a citizen of Arizona, residing in Glendale, Arizona.

13.    Defendant Murphy was a director of the Bank from on or about June 26, 2007, until on or about July 21, 2009. Murphy is a citizen of Arizona, residing in Lake Havasu City, Arizona.

14.    Defendant Whitaker was a director of the Bank from on or about April 17, 2007, until on or about July 21, 2009. Whitaker is a citizen of Arizona, residing in Phoenix, Arizona.

## JURISDICTION AND VENUE

15.     This action arises under the laws of the United States of America including 12 U.S.C. § 1821(d)(2) and (k) and 12 U.S.C. § 1819(b).  This Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.  Actions in which the FDIC-Receiver is a party are deemed to arise under federal law under to 12 U.S.C. § 1811, *et seq.*  Under 12 U.S.C. § 1819, the FDIC-Receiver has the power to sue in any court.

16.     The Court has personal jurisdiction over all the Defendants who at all relevant times resided in Arizona, conducted the Bank's business in Arizona, or both.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b).  All or substantially all of the events or omissions giving rise to the claims asserted here occurred in this district.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.     CBOA's Loan Policy And Loan Approval Authorities.**

18.     On November 28, 2003, CBOA opened for business as Cactus Commerce Bank, offering a range of commercial and consumer banking products and services.  Cactus Commerce was acquired on September 29, 2006, by Bancorp, a Nevada-based bank-holding company that owned CBON.  At that time, Cactus Commerce's name was changed to Community Bank of Arizona.

19.     CBOA had specific written policies and procedures governing the underwriting, acquisition, and administration of loans (the "Loan Policy").  The Loan Policy was intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure.  Although the Loan Policy was amended at various times, key provisions requiring CBOA to conduct its own independent underwriting analyses remained unchanged.  These provisions included several related requirements, including but not limited to the following:

(a)    CBOA could purchase loans and leases from other banks only if the loans met all underwriting and policy requirements for CBOA.

(b)    CBOA could purchase loans and leases from other banks if CBOA "conducted its own independent analysis of the financial statements and other aspects of the credit."

(c)    New real estate loans larger than $250,000 required a current appraisal.  Appraisals would be current if less than 12 months old and local market conditions remained materially unchanged during that 12-month period.

(d)    Commercial loans required a financial analysis covering at least two years, including all significant financial information on the borrowers and guarantors based on current financial statements.

(e)    Financial statements over 12 months old would be considered stale.

(f)    Financial statements were required to be audited or accompanied by tax returns for verification.

(g)    A CBOA loan officer had to conduct a site inspection for any loan secured by real estate.

20.    Approval authorities during the relevant period depended on the total credit amount outstanding to the borrower at the time of approval.  Among other things, the President, CCO, and Chairman had individual authority up to $1 million to purchase secured loans, and the BLC had authority up to 15 percent of CBOA's Tier 1 capital—an amount that ranged during relevant times from approximately $3.4 million to approximately $3.6 million.  CBOA's BLC consisted of the members of CBOA's Board of Directors.  Each of the Defendants, in his or her capacity as a director, was also a member of the BLC.

**B.     CBOA Acquires Risky CRE Loans From CBON Without Independent Underwriting.**

21.    Following its acquisition by Bancorp, CBOA substantially increased its concentration in risky commercial real-estate loans ("CRE" loans).  From November

2006 (just two months after the Bancorp acquisition) until its failure, CBOA originated or acquired loans with a total gross balance of approximately $84 million, 98 percent of which were CRE loans.

22.   CBOA acquired these CRE loans in large part by purchasing participation interests in CRE loans that were originated by CBON, principally to real-estate developers in Nevada. In fact, of the CRE exposure that CBOA added beginning in November 2006, more than an estimated 60 percent of the lending resulted from purchasing twenty CBON participation loans, including the purchase of interests in three of the improper and grossly negligent loans specifically described below.

23.   From the date of Bancorp's acquisition of CBOA until its failure, Defendant Jamison was Chairman and CEO of both Bancorp and CBON, in addition to his officer and director positions at CBOA. During the six-month period in which Jamison was President of CBOA, the Bank purchased over approximately $34 million worth of participation loans from CBON. Those participations include the purchase of three of the improper and grossly negligent loans specifically described below as well numerous other risky loans that became adversely classified even before CBOA's failure. All told, approximately 75 percent of the participations purchased from CBON during Jamison's tenure were problem loans for CBOA by the time of its failure.

24.   Jamison's stated justification for directing CBOA's purchases of these assets from CBON was to lower CBON's high concentration of CRE loans while also providing additional revenue for CBOA. The Defendants who approved these purchases thus breached their fiduciary duties to CBOA by allowing CBOA to serve as a repository for CBON's problem assets, and they did so without conducting the most basic underwriting and due diligence required under CBOA's Loan Policy, banking regulations, and safe-and-sound banking practices.

25.   The participations purchased from CBON were approved by one or more of the Defendants without ensuring that the purchases met all of CBOA's underwriting

requirements, without conducting independent financial analysis as part of the purchases, without obtaining updated appraisals of the collateral for the purchased loans, without obtaining or analyzing financial statements for guarantors, or without conducting independent site inspections as required by the Loan Policy. In fact, the credit-approval presentations for acquiring these participation loans often were the same or materially indistinguishable from the presentations that CBON originally used to approve the loans albeit under more favorable market conditions.

26.     Rubber stamping the acquisition of these loans caused CBOA significant injury. As of July 21, 2009, approximately 60 percent of the loans that CBON had originated and participated to CBOA were designated as "nonaccrual," meaning that the Bank deemed the likelihood of repayment so dim that it could no longer accrue interest on the loans.

**C.     CBOA Ignores Warnings in Acquiring Risky CRE Loans From CBON.**

27.     These participated loans also contributed to CBOA's general over-concentration in CRE loans, despite specific and repeated warnings from regulators of the risks in carrying a portfolio concentrated in CRE lending. For example, effective on December 12, 2006 (less than three months after Bancorp acquired CBOA), the FDIC and other bank regulators issued Financial Institution Letter 104-2006, *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. 74580-01, 87 (Dec. 12, 2006). This guidance warned that "fairly rapid changes" in CRE markets can occur, that institutions with CRE concentrations in excess of 300 percent of Tier I capital would receive "greater supervisory scrutiny," and that overall "there are substantial risks posed by CRE concentrations." The guidance also specifically described the importance of "stress testing" CRE portfolios as part of overall risk-management.

28.     The following day, December 13, 2006, CBOA similarly received a joint Report of Examination in which the FDIC and ADFI discussed the Bank's exposure to

CRE lending. The regulators noted that the Bank planned to increase its exposure to CRE lending following its acquisition by CBON's parent and that management reporting and Board oversight needed improvement. This report also criticized CBOA's method for analyzing CRE concentration and repeated a recommendation from the Bank's prior Report of Examination that CBOA include unfunded CRE commitments in the calculation to avoid underestimating the Bank's CRE concentration.

29.     In rubber stamping the purchase of CRE loans participated from CBON and other banks, the Defendants ignored these warnings. Under leadership of some or all of the Defendants, CBOA continued to originate or acquire CRE loans without implementing appropriate stress testing as provided for in the 2006 interagency guidance. CBOA likewise continued to originate or acquire CRE loans without correcting the Bank's method for analyzing CRE concentrations. And the Bank's CRE concentrations continued to climb. By April 30, 2009, for example, CBOA's concentration in CRE loans was approximately 450 percent of Tier I capital.

**D.     CBOA Purchases Additional Loans From First National Bank Of Arizona Without Independent Underwriting.**

30.     In addition to the participation loans purchased from CBON, the Defendants also failed to independently underwrite numerous loans purchased from First National Bank of Arizona ("FNB Arizona"), including the purchase of three of the improper and grossly negligent loans described below.

31.     On March 19, 2008, as part of a bulk purchase approved by the BLC through an e-mail vote, CBOA purchased a number of residential-construction loans from FNB Arizona. The approval of this purchase occurred less than two months after it was publicly reported that FNB Arizona was in financial difficulty and halting its retail mortgage-lending activities, resulting in 35 layoffs, and less than a month before FNB Arizona merged into another bank that itself failed and was closed by regulators the following month. More importantly, the approval of this purchase occurred months if not

more than a year after FNB Arizona had originated the loans being purchased and without CBOA's having independently re-underwritten any of the credits. In many cases, the Defendants approved the purchase of the loans after considering nothing more than a one-line summary of the proposed loan. No independent credit-approval presentation or other analysis was prepared. Defendants thus approved the purchase of these FNB Arizona loans based on FNB Arizona's original and potentially out of date appraisals and other underwriting information and without conducting independent due diligence in violation of CBOA's Loan Policy, underwriting requirements, and prudent banking practices.

**E.    Regulators Criticize The Defendants' Failure To Perform Independent Underwriting.**

32.    The Defendants' unsound management and oversight practices were specifically identified by state and federal regulators in their examination of the Bank's loan-purchase-approval functions. For example, on or about July 28, 2008, CBOA received a Joint Report of Examination in which the FDIC and ADFI identified "weakness in oversight" by CBOA's management, including "failure to provide for an independent loan review." The regulators further stated that management should develop formal policies governing transactions with affiliates, including a "[p]rohibition on the purchase of problem loans." The FDIC and ADFI in this report also criticized CBOA's CRE concentration and recommended that CBOA stress test its CRE loans.

33.    On October 10, 2008, following a second 2008 examination, the FDIC issued a formal letter to CBOA's Board identifying significant regulatory concern about the health of the institution and the quality of the Bank's loan portfolio. Then, on March 20, 2009, in an exit meeting between the FDIC and Lori Anderson, CBOA's Chief Credit Officer, the FDIC specifically criticized the rubber stamping of loan purchases approved by CBOA's management. According to Anderson (who reported on the meeting in a memorandum sent to Jamison, Curley, and others), examiners had stated that

"[p]articipations purchased do not appear to be underwritten independently" and that appraisals obtained by an originating bank "should be reviewed and the review documented independently" by CBOA. Anderson further relayed that examiners had noted that "Arizona loans" purchased from other banks appeared to be "rubber stamped" by the BLC without independent analysis, that CBOA did not appear to review or document its review of loans, and that CBOA did not appear to be exercising its autonomy as an institution independent from CBON.

34.    Despite these criticisms, CBOA continued to loan approvals from CBON. For example, in an email five days after the March 20, 2009, exit meeting, loan officer Mark Hunton complained that management continued to instruct him "to just 'cut & paste'" what CBON previously had prepared rather than prepare independent credit approval presentations in connection with a loan renewal.

35.    These deficient underwriting practices together with CBOA's excessive exposure to CRE lending and the Defendants' other breaches exposed CBOA to the inevitable cyclical decrease in real estate values. As real estate markets began to decline in 2006, the Bank's financial condition deteriorated. On August 14, 2009, the ADFI closed the Bank and the FDIC was appointed Receiver.

**F.    Specific Loan Purchases That Were Grossly Negligent.**

36.    Defendants engaged in a pattern and practice of approving loan purchases that evidenced systematic deficiencies in the credit underwriting, approval, and administration process, that violated careful, reasonable, and prudent banking practices, and that violated or failed to comply with the Bank's Loan Policy.

37.    Approvals of the following loan purchases illustrate the types of failures, breaches, and violations of duty that the Defendants committed, that damaged the Bank, and that constitute negligence, gross negligence, and breach of fiduciary duty either separately or together as a pattern or practice. (The loan purchases are described using initials for privacy reasons; the full names will be identified to the Defendants.)

### 1. S.M., LLC

38. On or about January 24, 2006, CBON extended a $12.5 million loan to a single-purpose entity, S.M, LLC, to finance the purchase of a 9.43 acre parcel in Las Vegas, Nevada, intended for the construction of a hotel and retail center. The loan was secured by the subject property. Anticipated refinancing through a future (but yet-to-be obtained) construction loan was the primary repayment source. An interest-reserve account also was established. That account allowed CBON to advance loan funds to pay the interest charged on the outstanding loan balances with the interest then capitalized and added to the outstanding balance.

39. Nearly two years later, on or about December 27, 2007, CBOA's BLC approved the purchase from CBON of a participation in the S.M. loan equal to $3.5 million, which was at or very near the largest amount possible under the Bank's legal lending limit. Defendants Jamison, Nelson, Aman, Appledorn-March and Murphy approved the purchase.

40. Approving this acquisition violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting of the purchase by CBOA; (2) the appraisal for the collateral property was more than two years old and not updated prior to approval of the purchase; (3) the financial information relied upon by the BLC was stale since it was over one year old; (4) no independent verification of the financial statements was conducted; and (5) no independent onsite inspection of the project was conducted. The Defendants who approved this purchase knew or should have known of these violations and the significant risks of this acquisition yet approved the acquisition in disregard of those risks.

41. When the BLC approved the purchase of this participation loan almost two years after CBON had made the original loan, construction still had not started, and the original loan had reached its maturity date. Within six weeks of Defendants Jamison's,

Nelson's, Aman's, Appledorn-March's, and Murphy's approval of the purchase, CBON downgraded the loan. If the approving Defendants had discharged their duties, they would have discovered before purchasing the loan the weaknesses that shortly thereafter caused the downgrade.

42.     Within nine months of purchasing the participation loan, CBOA placed the loan on nonaccrual. Foreclosure proceedings then began and the collateral property was sold to CBON at a trustee's sale shortly before the failure of CBON and CBOA. The grossly negligent and otherwise improper acquisition of the participation loan resulted in substantial damage to CBOA in an amount to be proven at trial.

### 2.     C.W., LLC

43.     On or about March 30, 2007, CBON extended a $22 million loan to a single-purpose entity, C.W, LLC, to finance existing debt with another bank and investors, and to fund costs over the next year to sell several large parcels of land zoned for mixed use in Las Vegas. The loan was secured by the subject property, and interest payments were advanced using an interest-reserve account.

44.     Nearly nine months later, on or about December 27, 2007, CBOA's BLC approved the purchase from CBON of a participation interest in the loan equal to $3.5 million, which was at or very near the largest amount possible under the Bank's legal lending limit. Defendants Jamison, Nelson, Aman, Appledorn-March and Murphy approved the purchase.

45.     Approving this acquisition violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting of the purchase by CBOA; (2) the appraisal for the collateral property was more than a year old and not updated prior to purchase of the participation; (3) the financial information relied upon by the BLC was stale since it was over one year old; (4) no independent verification of the financial statements was conducted; and (5) no independent onsite inspection of the project was conducted. The

Defendants who approved this purchase knew or should have known of these violations and the significant risks of this acquisition yet approved the acquisition in disregard of those risks.

46. CBOA would not have made this acquisition had the approving Defendants discharged their duties. Among other things, a "key risk" with this loan identified even in CBON's original credit-approval presentation was a slowdown in the market, and the Las Vegas real-estate market experienced a further slowdown between the date of the appraisal that CBON had used to underwrite the original loan and the date that Defendants Jamison, Nelson, Aman, Appledorn-March and Murphy approved the purchase of the participation. Having a current appraisal would have shown this loss of value.

47. At the time of the FDIC-Receiver's appointment, this loan was past due and thereafter resulted in a trustee's sale of the collateral property to the FDIC-Receiver. The grossly negligent and otherwise improper acquisition of this participation loan resulted in substantial damage to CBOA in an amount to be proven at trial.

### 3. W.D., LLC

48. On or about May 12, 2006, CBON extended a $21 million loan to a single-purpose entity, W.D., LLC, to finance the development of a retail center in Henderson, Nevada. The loan was secured by the subject property and its improvements. The primary repayment source was anticipated refinancing through construction loans, and interest payments were advanced using an interest-reserve account.

49. Over eighteen months later, on or about December 27, 2007, CBOA's BLC approved the purchase from CBON of a participation in the loan equal to $3.5 million, which was at or very near the largest amount possible under the Bank's legal lending limit. Defendants Jamison, Nelson, Aman, Appledorn-March, and Murphy approved the purchase.

50.     Approving this acquisition violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting of the purchase by CBOA; (2) the appraisal for the collateral property was more than eighteen months old and not updated prior to purchase of the participation; and (3) no independent onsite inspection of the project was conducted.  The Defendants who approved this purchase knew or should have known of these violations and the significant risks of this acquisition yet approved the acquisition in disregard of those risks.

51.     CBOA would not have made this acquisition had the approving Defendants discharged their duties.  For example, the appraisal that CBON used in underwriting the original loan was dated May 23, 2006 and estimated that the property following completion of construction would have a value of $28 million.  Local real-estate markets declined substantially, however, from the date of that appraisal and the date that Defendants Jamison, Nelson, Aman, Appledorn-March, and Murphy approved the purchase of a participation interest in the loan.  Thus, requiring a current appraisal as required by the Bank's Loan Policy would have shown this loss of value and would have shown that the loan-to-value ratio for the property exceeded the Bank's maximum of 75 percent.  Moreover, conducting independent underwriting as required by the Loan Policy before approving this purchase would have revealed that the project was substantially delayed.  For example, the credit-approval presentation that CBON had used to originate the loan in May 2006 forecast that the borrower would obtain all necessary permits and approvals for the project by August 2006 and that it would begin construction of the first retail building listed in the site plan three months later.  The credit-approval presentation that CBOA relied on some eighteen months later to approve the loan purchase repeats that forecast verbatim, thereby failing to reveal that in fact the necessary approvals and permits were at least eight months off schedule and that no construction had started even

as of December 2007 when Defendants Jamison, Nelson, Aman, Appledorn-March, and Murphy approved the purchase of this participation loan.

52. Before the FDIC-Receiver's appointment, this participation loan was more than 90 days past due and a trustee's sale of the collateral property had been scheduled and then delayed on account of the borrower's filing a case under the U.S. Bankruptcy Code. Ultimately, the collateral property was sold to the FDIC-Receiver at a trustee's sale. The grossly negligent and otherwise improper acquisition of this participation loan resulted in substantial damage to CBOA in an amount to be proven at trial.

### 4. D.C.

53. On or about February 1, 2007, FNB Arizona extended a $1.17 million loan to D.C. to finance the construction of a second residence in Bullhead City, Arizona. The loan was secured by the subject property. The repayment source was unknown at the time of loan approval.

54. On or about March 19, 2008, the BLC approved the purchase from FNB Arizona of this loan in an amount equal to the funded balance of the loan plus a nominal fee. Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase.

55. Approving this acquisition violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting of the loan purchase by CBOA; (2) the loan was originated more than a year earlier, and no independent appraisal was completed prior to CBOA's approval of the purchase; (3) the borrower's financial statements were over one year old and stale; (4) no independent verification of the financial statements was conducted; and (5) no independent onsite inspection of the property was conducted. The Defendants who approved this transaction knew or should have known of these violations and the risks of acquiring the loan yet approved the acquisition in disregard of those risks.

56. In particular, the D.C. loan was a stated-income loan extended without an independent analysis of updated financial statements or other aspects of the credit after

the loan was originated by FNB Arizona. The appraisal and stated income statements were more than a year old, and market conditions had materially changed when Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase of the loan.

57. CBOA would not have made this acquisition had the approving Defendants discharged their duties. The housing market had declined substantially between the January 14, 2007 appraisal used in the original underwriting and the date that Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved purchase of the loan on March 19, 2008. Requiring a current appraisal would have shown this loss of value. Indeed, the property appraised at only $400,000 on September 16, 2008 after CBOA had paid more than $440,000 to purchase this loan. Moreover, requiring current financial statements for the borrower prior to approval of the purchase of the loan, as required by the Loan Policy, would have revealed that the borrower's income had dropped and that he likely could not afford to complete the planned construction project or pay-off the loan when it reached maturity.

58. Before the FDIC-Receiver's appointment, the Bank commenced foreclosure proceedings, resulting in a trustee's sale of the collateral property to CBOA. The grossly negligent and otherwise improper acquisition of this loan resulted in substantial damage to CBOA in an amount to be proven at trial.

### 5. J.S.

59. On or about October 23, 2006, FNB Arizona extended a $550,000 loan to J.S. to finance the remodel of an existing residence in Rio Verde, Arizona, which the borrower supposedly occupied at that time. The loan was secured by the subject property. The repayment source was unknown at the time of loan approval.

60. On or about March 19, 2008, the BLC approved the purchase from FNB Arizona of the J.S. loan in an amount equal to the funded balance of the loan plus a

nominal fee. Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase.

61.    Approving this acquisition violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting by CBOA; (2) the loan was originated more than a year earlier, and no independent appraisal was completed prior to approval of the purchase; (3) the borrower's financial statements were over one year old and stale; (4) no independent verification of the financial statements was conducted; and (5) no independent onsite inspection of the project was conducted. The Defendants who approved this loan purchase knew or should have known of these violations and the risks of acquiring the loan yet approved the acquisition in disregard of those risks.

62.    In particular, the J.S. loan was a stated-income loan extended without an independent analysis of updated financial statements or other aspects of the credit after the loan was originated by FNB Arizona. The appraisal and stated income statements were almost eighteen months old, and market conditions had materially changed when Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase of the loan.

63.    CBOA would not have made this acquisition had the approving Defendants discharged their duties. The housing market had declined substantially between September 18, 2006, the date of the most recent appraisal, and March 19, 2008, the date Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase of the loan. A current appraisal would have shown this loss of value. Indeed, the original appraisal used to underwrite the loan valued the property at $710,000 whereas an appraisal on June 2, 2008, valued the property at $480,000 as completed and $380,000 as is. Requiring current financial statements on the borrower as required by the Loan Policy also would have revealed that the borrower's income had dropped significantly, that he had purchased a second home with 100 percent financing to live in during the

construction, that he could no longer afford to service all of his debt or complete the planned remodeling project, and that his credit score had fallen to 581—well below the Bank's Loan Policy requirements.

64.     Before the FDIC-Receiver's appointment, the Bank commenced foreclosure proceedings, resulting in the borrower's deeding the collateral property to CBOA in lieu of foreclosure. The grossly negligent and otherwise improper acquisition of this loan resulted in substantial damage to CBOA in an amount to be proven at trial.

### 6.     B.B.

65.     On or about July 12, 2007, FNB Arizona extended a $562,500 loan to B.B. to finance the construction of a second residence in Mayer, Arizona. The loan was secured by the subject property. The primary source of repayment was the borrower's stated income.

66.     On or about March 19, 2008, the BLC approved the purchase from FNB Arizona of the B.B. loan in an amount equal to the funded balance of the loan plus a nominal fee. Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase.

67.     This loan approval violated CBOA's Loan Policy, underwriting requirements, and safe-and-sound banking practices in at least the following respects: (1) no independent underwriting by CBOA; (2) no independent evaluation of the appraisal occurred; (3) no independent verification of the financial statements was conducted; (4) no independent onsite inspection of the project was conducted; and (5) the loan-to-value ratio for the collateral property exceeded the Loan Policy maximum of 75 percent. The Defendants who approved this loan purchase knew or should have known of these violations and the risks of acquiring the loan yet approved the acquisition in disregard of those risks.

68.     In particular, the B.B. loan was a stated-income loan extended without an independent analysis of updated financial statements or other aspects of the credit after

the loan was originated by FNB Arizona. Market conditions also had materially changed at the time Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase of the loan.

69.   CBOA would not have made this acquisition had the approving Defendants discharged their duties. The original loan was days away from the original maturity date reflected on the one-line loan summary provided to the BLC when it considered the purchase. Defendants Jamison, Curley, Nelson, Aman, and Whitaker approved the purchase without adequate analysis of the credit risk or current financial information of the borrower. In an investigation conducted after the purchase, the Bank determined that the borrower never intended the construction to be his second home, that he instead had purchased the property and subdivided it for purposes of resale, and that the loan accordingly was a "speculative" transaction unsuitable for the Bank to have approved. In September 2008, the borrower also revealed that he had financial problems related to other properties. Conducting a site inspection and requiring up to date credit analysis on the borrower prior to loan approval as required by the Loan Policy would have revealed the excessive credit risk and other critical problems with this transaction.

70.   Before the FDIC-Receiver's appointment, the Bank commenced foreclosure proceedings, resulting in a trustee's sale of the collateral property to CBOA. The grossly negligent and otherwise improper purchase of this loan resulted in substantial damage to CBOA in an amount to be proven at trial.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>
**Negligence Claim Against Officer and Director Defendants**
**(Defendants Jamison, Curley and Nelson)**

71.   The FDIC-Receiver repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 70 of this Complaint.

72.   As officers of CBOA, Defendants Jamison, Curley, and Nelson individually owed the Bank, its shareholders, account holders, and depositors a duty to exercise the

degree of diligence, care, skill, and good faith that ordinarily prudent persons in like positions would exercise under similar circumstances in the evaluation and approval of the loan purchases, including, but not limited to:

(a)   conducting proper due diligence on proposed loans and the risks that purchasing such loans pose to the Bank before approving the purchase of them;

(b)   complying with the Bank's loan policies;

(c)   ensuring that any loan purchases were underwritten in a safe and sound manner;

(d)   ensuring that any loan purchases were made to creditworthy borrowers with the ability to repay, and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank;

(e)   ensuring that any loan purchases did not violate applicable banking laws and regulations;

(f)   ensuring that any loan purchases did not create unsafe and unsound concentrations of credit;

(g)   exercising independent judgment in the best interest of the Bank in the conduct of its business affairs and to avoid conflicts of interest; and

(h)   performing faithfully and diligently their duties as members of the Bank's BLC.

73.   In disregarding their duties as officers of the Bank (including the duties described in the preceding paragraph), each of the Officer and Director Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith that ordinarily prudent persons would have exercised under similar circumstances in like positions.

74.   The negligent acts and omissions of Defendants Jamison, Curley and Nelson have directly and proximately caused substantial damage in an amount to be proven at trial but that exceeds $11 million.

75.    With respect to their negligent actions and inactions, Defendants Jamison, Curley, and Nelson pursued a common plan or design and, therefore, each is jointly and severally liable for all losses resulting from the purchase of loans that each approved.

## COUNT II

**Gross Negligence Claim Against All Defendants**
**(Defendants Jamison, Curley, Nelson, Aman, Appledorn-March, Murphy, and Whitaker)**

76.    FDIC-Receiver repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 70 of this Complaint.

77.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds officers and directors of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

78.    Defendants Jamison, Curley, Nelson, Aman, Appledorn-March, Murphy, and Whitaker knew or should have known of significant and obvious risks related to the specific, grossly negligent, loan purchases described above and other similar loan acquisitions yet approved the acquisitions in disregard of those risks.  The Defendants acts of gross negligence include, but are not limited to, the following acts and omissions:

(a)    failing to conduct proper due diligence on proposed loan purchases and the risks such purchases posed to the Bank before approving them;

(b)    failing to comply with the Bank's loan policies;

(c)    failing to ensure that loan purchases were underwritten in a safe and sound manner;

(d)    failing to ensure that loan purchases were made to creditworthy borrowers with the ability to repay, and were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank;

(e)    failing to ensure that loan purchases did not violate applicable banking laws and regulations;

(f)     failing to ensure that loan purchases did not create unsafe and unsound concentrations of credit;

(g)     failing to exercise independent judgment in the best interest of the Bank in the conduct of its business affairs and to avoid conflicts of interest; and

(h)     failing to perform faithfully and diligently their duties as members of the Bank's BLC.

79.     The Defendants' actions and omissions were so imprudent, indifferent, and careless in degree as to constitute gross negligence under Arizona law.  Specifically, and as detailed above, Defendants systematically and repeatedly ignored the Bank's own Loan Policies and underwriting guidelines as well as sound or reasonably prudent banking practices when they approved the loan purchases described above and other similar purchases despite numerous and obvious risks related to the transactions.

80.     Defendants' grossly negligent acts and omissions have directly and proximately caused substantial damage in an amount to be proven at trial but that exceeds $11 million.

81.     With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design and, therefore, each is jointly and severally liable for all losses resulting from the purchase of loans that each approved.

### COUNT III

**Breach of Fiduciary Duties Against All Defendants**

82.     FDIC-Receiver repeats and makes a part hereof each and every allegation contained in Paragraphs 1 through 70 of this Complaint.

83.     Defendants, individually and collectively, owed the Bank and its shareholders, account holders, and depositors the fiduciary duties of due care, loyalty, and to act in good faith and in the best interest of the Bank.

84.     The Defendants, individually and collectively, breached their fiduciary duties to CBOA, and its depositors and shareholders, by failing to discharge their duties in good faith, and by failing to exercise that degree of diligence, care, loyalty, judgment

and skill required of them in the conduct, direction, supervision, and control of the Bank's business and affairs. The Defendants committed or permitted acts and omissions that have resulted in severe damage, including, but not limited to, those acts and omissions listed in Paragraph 78 of this Complaint.

85. The Defendants' breaches of their fiduciary duties have directly and proximately caused substantial damage in an amount to be proven at trial but that exceeds $11 million.

## REQUEST FOR RELIEF

86. Pursuant to Federal Rule of Civil Procedure 38, the FDIC-Receiver demands a trial by jury on all claims.

WHEREFORE, as a result of the unlawful acts and omissions of Defendants set forth above, the FDIC-Receiver requests the entry of judgment against Defendants as follows:

(a) for damages, jointly and severally, of at least $11 million, and any excess amount to be proven at trial;

(b) for its costs of suit against all Defendants;

(c) for prejudgment interest; and

(d) for such other and further relief as this Court deems just and proper.

Dated this thirteenth day of July, 2012.

Antony S. Burt
Matthew C. Crowl
David C. Giles
Jeannice D. Williams
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
(312) 258-5500
(312) 258-5700 (facsimile)
aburt@schiffhardin.com
mcrowl@schiffhardin.com
dgiles@schiffhardin.com
jdwilliams@schiffhardin.com
*(Pro Hac Vice* to be filed)

*Counsel for the Federal Deposit Insurance Corporation, as Receiver for Community Bank of Arizona, Plaintiff*